## WALTERS *v.* FINE, et al.

No. 40608 January 13, 1958 99 So. 2d 669

*Melvin, Melvin & Melvin,* Laurel, for appellant.

*Deavours & Hilbun, Boyd & Holifield,* Laurel, for appellees.

McGEHEE, C. J.

On November 10, 1950, the appellees, N. Fine and others, as owners of a two-story building on Central Avenue in Laurel, Mississippi, leased the west one-half of the first floor thereof to the appellant M. J. Walters, doing business as One Hour Cleaners, to be used in operating a pressing, cleaning and tailoring establishment. The lease was for a period of three years, beginning December 1, 1950. During the month of December 1950 the appellant expended a substantial sum of money in making the leased premises suitable for the operation of his said business. He began the operation of his business on January 2, 1951, and a fire originated in the east half of the first floor of the said building on the night of March 12, 1951. Considerable damage was done where the fire originated, and also to the windows upstairs in the building, as well as to the premises leased by the appellant from leakage and the use of the fire hoses in extinguishing the fire.

Because of the damaged condition of the premises, it was approximately one week before the appellant could resume the operation of his business. Thereafter he continued in the occupancy of the leased premises until August 1953. He failed to pay the monthly rent stipulated in the lease contract for the months of August, September, October and November 1953, and there is no question presented by this record but that the appellees would have been entitled to recover a judgment for the four months of unpaid rent at $125 per month, together with a reasonable attorney's fee for the collection of the same,

unless the appellant was entitled to recover on his counterclaim in this suit filed pursuant to Section 1483.5 of the Miss. Code of 1942.

The jury in the County Court of the Second Judicial District of Jones County first returned two verdicts, one for the sum of $625 in favor of the appellees, as landlords, and one for the sum of $1,291.14 in favor of the appellant, as lessee. The county judge had the jury to return to its room for the purpose of putting the verdict in proper form, and with the result that the jury then returned a verdict in favor of the appellant, the lessee, for the sum of $589.14. From this judgment, the appellees herein appealed to the circuit court of said county. That court, in considering the case as an appellate court, held that the appellees, as landlords, were entitled to recover the sum of $500 as rent, plus $100 as a reasonable attorney's fee, together with all costs, and that the jury in the county court should have been peremptorily instructed therefor. The circuit court also held that "the burden of proof was not met by the defendant (lessee) on his counterclaim sufficient to make it a jury question as to whether or not there was a proximate causal connection, in accordance with the allegations of the counterclaim, between the alleged negligence of the plaintiffs in causing repairs to be made to the building * * * and the alleged losses in profits of the defendant's business after the repairs were made", and that therefore the defendant's counterclaim should be denied. From the judgment of the circuit court, the appellant, as lessees, has appealed the case to this Court.

Par. 4 of the written lease contract entered into by the parties on November 10, 1950, reads: "It is agreed between the parties hereto that if the said premises are totally destroyed by fire, tornado, or other casualty and the said premises cannot be repaired and rebuilt within a period of sixty days, then either party to this contract shall have the option of terminating this lease."

Par. 9 of the said lease contract provides, among other things, that: "The lessee accepts said premises in the condition said premises are now found and will make any repairs and improvements necessary to make the said premises useable for the purposes of said lessee, it being distinctly understood that lessors are to be at no expense for repairs or for any improvements to said premises, walls, ceiling and floor during the term of this lease."

 █ It was held in the case of Jones v. Millsaps, et al., 71 Miss. 10, 14 So. 440, that the general rule is that, in the absence of express covenant in the lease, and in the absence of deceit and misrepresentation, there is no implied covenant that the lessor will make repairs; nor is there an implied covenant on lessor's part that the premises are suitable for the lessee's business.

(Hn 2) The lease now before us contains no express covenant obligating the landlord to make repairs, but the Court said in the case of Green v. Long, 152 Miss. 117, 118 So. 705, that: "It is well-settled, however, that, although the lease does not bind lessor to make repairs, yet if he voluntarily undertakes to make them during the term of the lease, he is liable for the want of due care in the execution of the work." Then there is set forth in the opinion in that case a clear statement of the generally accepted rule on this point, quoted from 16 R. C. L. 1045.

The proof on behalf of the lessee, who was defendant in the court below, was to the effect that on the day following the fire he inquired of the appellees as to what they intended to do about the building, since it was at that time in ruins; that thereupon he was assured by one of the appellees, who was acting as agent for all of them, that if he would remain in the building he would have the same repaired immediately so that the defendant, as lessee, could continue the operation of his business as theretofore; that within a few days thereafter a crew of men came and attempted to make some repairs, and that the lessee was then assured by the agent and representative

of the lessors that the building had been fixed, and that relying on this assurance the lessee continued in the occupancy of the leased premises, but that every time that it would rain thereafter, it became necessary for the lessee and his employees to place buckets, pans, etc. in the leased premises to catch the rain water that would come through from overhead; and that the lessee complained to the said agent on numerous occasions, including each time that he would make a monthly payment of rent, and that on each occasion the said agent would again assure him that the condition complained of would be repaired.

The contractor who was in charge of the crew who attempted to make the repairs testified on behalf of the lessee that he had been employed by the lessors to make temporary repairs on the building and that he had undertaken to make only such repairs. The lease contract, however, covered a period of three years, as aforesaid.

However, the lessee, instead of making the repairs himself and charging the expense thereof against the rent due the landlords, in view of the landlords alleged breach of a voluntary oral agreement to make the same, and instead of asking permission of the landlords to be allowed to make the overhead repairs so as to thereby reduce his damages and charge the expense thereof against the rent, the lessee continued to occupy the leased premises for more than two years after the fire. The authorities seem to recognize a difference when the expense to the lessee for making the repairs himself, upon the failure or refusal of the landlord to do so, would be small as compared with a substantial or large sum of money for that purpose.

The lessee undertook to sustain his counterclaim by proving that from January 2, 1951, until March 12, 1951, when the fire occurred, he had gross receipts which had averaged during that period of time the sum of $90.94 per day, and by proving that after the fire and throughout the remainder of the year 1951, his average daily gross receipts were only $33.14 per day. Although

admitting that he had kept a payroll, which would have informed the jury to that extent as to what his expenses were during the period before and after the fire, he did not produce such payroll or other records showing his operating expenses so as to enable the jury to determine, with any reasonable degree of certainty, his net profits before and after the fire. The plaintiffs in the county court, that is to say the landlords, objected to the method whereby the defendant sought to sustain his counterclaim as to the damages that he had allegedly suffered. This method of trying to sustain his counterclaim was objected to and the objection should have been sustained, and the case should have been retried by order of the circuit court because of this error since this was the only data furnished to the jury to make its calculations in returning the verdict for the defendant.

The record as a whole discloses that the proof offered on behalf of the defendant shows that he had sustained some damages which should have been offset against the rent and attorney's fee sued for by the plaintiffs, and we have therefore concluded that since the county court permitted the defendant to use the improper measurement for the ascertainment of his damages, and over the objection of the plaintiffs, the cause should be reversed and remanded for a new trial; and that the plaintiff was not entitled to a peremptory instruction for the amount sued for.

The agent of the landlords denied having agreed to make the repairs immediately for the lessee in the event the lessee would agree to remain as an occupant in the leased premises, but the conflicting testimony in regard to what the landlords agreed to do, or did not agree to do, presented an issue of fact for the determination of the jury in the county court, and such as not to entitle the plaintiffs to a peremptory instruction for the unpaid rent and attorney's fee.

In Williston on Contracts, Rev. Ed., Vol. 5, in the second paragraph of Section 1404, it is stated: "On

breach of a covenant by the landlord to repair, the tenant may make the repairs himself and recover the reasonable expense of so doing. If the tenant does not make the repairs himself, the ordinary measure of damages is the difference in the rental value of the premises without the promised repairs and with them. If, however, the repairs involve slight expense, the measure of damages in such a case may properly be the expense of making them. Thus, where a few window panes are broken in a house in a northern latitude, although the rental value of the premises kept in that condition might be very slight, the measure of a tenant's damages if his landlord broke a covenant in the lease to repair, could hardly be based on this diminished rental value, but rather on the expense of making the repairs. And if the premises cannot be used until the repairs are made, the value for this period may also be recovered. Other consequential damages may be recovered if brought within the general principles governing such recovery; but damages for injury to the tenant or his property from continued failure to make repairs cannot ordinarily be recovered because under the rule of avoidable consequences the tenant should have made the repairs himself and recovered their cost from the landlord. But where the tenant in justifiable reliance on the landlord's promise to repair has suffered consequential injury which was a natural and probable consequence of the landlord's unexpected default, damages for the injury may be recovered. For breach of other covenants in leases, the ordinary principles of the law of damages will generally furnish a sufficient guide.''

In 116 A. L. R., at the beginning of p. 1239, it is stated in the annotation: ''The most usual rule or measure for assessing the tenant's damages for breach of the landlord's covenant to repair, where no special damages are sustained, namely, the difference between the rental value of the premises if kept in the condition of repair required by the landlord's covenant, and the rental value

in the condition in which they actually are, has been applied or recognized * * *'', citing a number of cases from Arkansas, Massachusetts, New York and Texas.

In the case of Saffer v. Levy, 88 N. Y. Supp. 144, it was held that the measure of damages for breach of contract to repair, when repairs are necessitated by the destruction in whole or in part of the leased premises by fire or other casualty, is the difference between the rental value of the premises partially destroyed, and the rental value had the premises been restored.

In 28 A. L. R., it is stated in the annotation on p. 1468 that: ''The court declares that upon breach by the landlord of his covenant to repair the tenant may: (1) Abandon the premises if they become untenantable by reason of want of repair; (2) make the repairs and deduct the cost from the rent; (3) occupy the premises without repairs, and recoup his damages in an action for rent; and (4) sue for damages for breach of covenant to repair. It does not, however, follow in all cases that it is entirely optional with the tenant as to which of these remedies he shall pursue, for his freedom of choice in this regard is limited by the rule heretofore referred to, which requires the innocent party, in case of a breach of the contract, to avoid or minimize his loss so far as that may reasonably be done without subjecting himself to loss.'' But see this annotation as a whole as to the duties of the respective parties under the facts in the case at bar. See also the note in 28 A. L. R. 2d, pp. 485, et seq.; 38 A. L. R. 2d, beginning on p. 717. Cf. Ice Company v. Holliday, 106 Miss. 714, 64 So. 658; Shell Petroleum Corporation v. Yandell, 172 Miss. 55, 158 So. 787; and 25 C. J. S. 516, under Profits.

The lessee made no claim for the damages caused to his property in the leased premises by reason of the fire itself and by reason of the turning of the water hoses into the building to put out the fire. His counterclaim is limited to the damages which he allegedly sustained on

account of the failure of the landlord to satisfactorily repair the premises pursuant to alleged agreement to do after the lessee had resumed the operation of his business in such leased premises after the fire, and for the remainder of the year 1951. There is no proof as to what the condition of the building was during 1952 and until the same was vacated by the lessee in August 1953.

Under the state of the proof contained in this record, we are unable to prescribe an exact rule to be applied as the measurement of damages in the instant case. Such measure of damages will necessarily depend upon the facts developed at a retrial of the case. If the facts should be such as to make the measure of damages the difference between the rental value of the premises before the fire following the expenditures made thereon by the lessee, and the rental value of the premises after the fire, the rental price provided for in the lease contract should be disregarded as the rental value before the fire, in consequence of the lessee having expended a large sum of money in rendering the premises suitable for his use for the purposes for which he had leased the same.

We confine our reversal of the case to the ground that the county court permitted the introduction of evidence as to the difference between gross receipts before the fire and gross receipts after the fire as being the measure of damages to guide the jury in assessing the damages under the counterclaim of the lessee, because by that method the jury was furnished no sufficient guide whereby they could ascertain the damages on the counterclaim with any reasonable degree of certainty.

The authorities hereinbefore cited, if carefully read and studied, should furnish the proper guide for the measure of damages sought to be recovered under the counterclaim. If it should develop under the facts shown on a new trial that the rental value of the property before and after the fire can be used as a proper measure of damages, the gross receipts of the business before and

after the fire would not be admissible to show that the rental value was less after the fire than it was prior thereto as the guide for determining what the amount of recovery, if any, in the light of the proof of a new trial, should be awarded on the counterclaim.

A claim was made by the lessee that he spent approximately $472 to protect his property after the fire, but he did not furnish the jury the data upon which he sought to establish this claim, but merely made the bare statement that he had made such expenditure to "protect his property."

Reversed and remanded.

*Kyle, Arrington, Ethridge* and *Gillespie, JJ.*, concur.

## ON MOTION TO DISMISS APPEAL

ETHRIDGE, J.

Appellees filed a motion to dismiss the appeal, on the ground that appellant failed to prepay the cost of the transcript, as required by Code of 1942, Section 1162. That statute provides that a person may appeal without supersedeas from a final judgment upon giving an appeal bond of $500, "but if appellant prepay the cost of the transcript, a bond for the sum of one hundred dollars shall be sufficient, or the appellant may deposit that sum with the clerk in lieu of the bond. . ."

Appellees, as plaintiffs, Fine et al., instituted this suit against appellant-defendant, Walters, in the County Court of the Second Judicial District of Jones County. Defendant filed a counterclaim, and judgment was rendered by the county court for defendant on his counterclaim. From that judgment the present appellees, Fine et al., appealed with supersedeas to the circuit court, which reversed the county court and rendered judgment for plaintiffs, appellees here. Since plaintiffs won their case in the circuit court, costs were assessed by the

circuit court against the defendant. All court costs through that date were $148.35.

Defendant Walters then undertook to appeal to this court. He deposited with the circuit clerk $100 in cash in lieu of a bond, as required by Code Section 1162. At the same time he deposited with the clerk $35 to prepay the cost of the transcript. Preparation by the circuit clerk of the transcript made in the circuit court for appeal to this court involved costs of $12.50.

▮▮ Appellant contends that ''the cost of the transcript'' required to be paid by him under Section 1162 for an appeal to the Supreme Court means solely the cost of the transcript in the circuit court, $12.50, and that such cost of transcript does not include the costs previously accrued in the appeal from the county court, $148.35. We cannot agree with that position. The statute states that appellant must ''prepay the cost of the transcript.'' That means the transcript upon which appellant is relying for his appeal. This necessarily includes the stenographer's notes of the testimony in the county court, and other costs accrued in the appeal to the circuit court. The circuit court reviewed the case on the record made in the county court.

The statute requires the payment of the cost of the transcript, and not merely a portion thereof or such part as was prepared in the circuit court. And it is reasonable that appellant prepay the cost of the complete transcript, in order to avail himself of it on appeal to the Supreme Court. Moreover, if on appeal here the case should be affirmed, the court reporter who transcribed the testimony, and the clerk who prepared the record for the appeal to the circuit court, would have neither a bond nor an adequate cash deposit to protect themselves and insure payment of the costs to them. Hence the cost of the transcript, referred to in Section 1162, means the entire cost of the transcript of all proceedings prior to the appeal to this court.

However, under Code Section 1959 appellant is entitled to pay the cost of the transcript and perfect his appeal. That statute provides that all defects and irregularities in the appeal bond may be cured by amendment. The amount prepaid for cost of transcript is included within that provision. Denkmann Lumber Company v. Morgan, 219 Miss. 718, 63 So. 2d 411 (1953).

The motion to dismiss the appeal is sustained, unless within ten days from this date appellant makes adequate prepayment of the cost of the transcript.

Motion to dismiss appeal sustained, unless within ten days appellant makes adequate prepayment of cost of transcript.

*Roberds, P. J.,* and *Hall, Lee,* and *Holmes, JJ.,* concur.